MONTGOMERY et al. v. CITY OF ALAMO
HEIGHTS et al. (Nos. 8032, 8033.)*

Court of Civil Appeals of Texas. San Antonio.
May 11, 1928.

Rehearing Denied June 9, 1928.

1. **Municipal corporations** ⟨⟩269(1), 270, 271,
272—City may delegate street, water, light,
and sanitation improvement by contract not
involving delegation of municipal powers.

Municipal corporation will not be restrained
in providing proper streets, water, lights, and
sanitation for inhabitants, in absence of illegal
or arbitrary action, but may delegate improve-
ment work by contract, providing municipal
powers are not delegated.

2. **Municipal corporations** ⟨⟩288(1)—City may
provide for payment of costs of street im-
provement entirely out of city's available
funds or partly by assessments (Acts 40th
Leg. 1st Called Sess. [1927] c. 106, § 17).

City may, under Acts 40th Leg. 1st Called
Sess. (1927) c. 106, § 17, provide for payment
of costs of street improvement entirely out of
city's available funds or partly by assessments,
without reference to Rev. St. 1925, arts. 1086–
1105, and article 1104.

3. **Municipal corporations** ⟨⟩269(2)—City had
discretion to determine whether entire street
should be paved, though paving was paid by
bond issue (Acts 40th Leg. 1st Called Sess.
[1927] c. 106, § 17).

City contracting for paving of streets under
Acts 40th Leg. 1st Called Sess. (1927) c. 106, §
17, had discretion to determine whether entire
street should be paved from curb to curb and
could leave certain strips unpaved, though pav-
ing was paid by general bond issue.

4. **Appeal and error** ⟨⟩931(3)—All necessary
facts are assumed to have been found in sup-
port of decree, where trial court failed to
make findings.

Where court, sitting as chancellor and trying
both law and facts, failed to make findings and
embrace them in the decree, reviewing court
must assume that all necessary facts were found
in support of the decree.

5. **Appeal and error** ⟨⟩1009(1)—Discretion of
trial judge sitting as chancellor should not be
disturbed, especially where wide range of evi-
dence was presented.

Discretion exercised by trial judge sitting
as chancellor should not be disturbed, especially
where he heard wide range of evidence and was
in favorable position to judge the equities and
merits of the case.

6. **Appeal and error** ⟨⟩544(1)—If pleadings
presenting general issue support judgment,
and no statement of facts is produced, discre-
tion of trial court trying facts will not be dis-
turbed.

Where verified answers deny all material al-
legations of petition and no statement of facts
is produced, trial court's exercise of discretion,
sitting as trier of facts, will not be disturbed, if
the pleadings support the judgment.

7. **Municipal corporations** ⟨⟩303(1), 339(1)—
Municipal ordinance or contract for improve-
ments, which restricts competition, favors
particular contractor, or involves increased
cost of work, is void.

Ordinance or contract of municipality for
construction of improvements, which prevents
or restricts competition, or favors contractor or
materialman, or increases cost of work, is void,
as well as proceedings had thereunder.

8. **Municipal corporations** ⟨⟩279—City con-
tracting for paving under 1927 act was not
bound by previous statutory requirements that
question of street improvement be submitted
to property taxpayers (Acts 40th Leg. 1st
Called Sess. [1927] c. 106, § 1; Rev. St. 1925,
arts. 1086, 1104).

City under 5,000, entering into contract for
paving under Acts 40th Leg. 1st Called Sess.
(1927) c. 106, § 1, permitting paving by incor-
porated cities, was not required to follow re-
quirements of Rev. St. 1925, arts. 1086, 1104,
requiring submission to vote of resident prop-
erty taxpayers of questions of street improve-
ment.

On Motion for Rehearing.

9. **Municipal corporations** ⟨⟩330(2)—Incor-
porated city held to have authority to enter
into contract for street paving without re-
quiring competitive bids (Acts 40th Leg. 1st
Called Sess. [1927] c. 106, §§ 1, 17; Rev. St.
1925, art. 1016).

Incorporated city held to have authority to
enter into contract for street paving under pav-
ing Acts 40th Leg. 1st Called Sess. (1927) c.
106, §§ 1, 17, and Rev. St. 1925, art. 1016, with-
out requiring competitive bids, though as a gen-
eral rule competitive bidding should be adopted
in order to secure contract for city at best rate.

10. **Municipal corporations** ⟨⟩288(1)—City held
to have authority to contract for street paving
to be paid for entirely from proceeds of bond
issue, without assessment of any portion of
costs against abutting property (Acts 40th
Leg. 1st Called Sess. [1927] c. 106, §§ 1, 17;
Rev. St. 1925, art. 1016).

Incorporated city held to have authority to
contract for street improvements to be paid en-
tirely by city out of proceeds of bond issue, with-
out providing for assessment against abutting
property owners under paving Acts 40th Leg.
1st Called Sess. (1927) c. 106, §§ 1, 17, and Rev.
St. 1925, art. 1016; Rev. St. 1925, tit. 28, cc. 8,
9 (arts. 1082–1105), articles 1082, 1086, § 1 and
articles 1087, 1088, 1090, 1093, 1104, being in-
applicable.

11. **Municipal corporations** ⟨⟩339(1)—City's
contract for street paving, entered into with-
out competitive bidding, to be paid wholly by
proceeds of bond issue, held valid, though work
was done by cost plus plan and contractor was
authorized to make expenditures (Acts 40th
Leg. 1st Called Sess. [1927] c. 106, § 1; Rev.
St. 1925, art. 1016).

Contract of city for street paving under pav-
ing Acts 40th Leg. 1st Called Sess. (1927) c.
106, § 1, and Rev. St. 1925, art. 1016, entered
into without competitive bidding and under which
payment was to be made entirely from proceeds
of bond issue, held valid, though work was done

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed.

by cost plus plan and contract authorized expenditures by contractor as city's fiscal agent, subject only to engineer's approval of amounts exceeding $500; there being no delegation to contractor of nondelegable municipal powers.

**12. Municipal corporations ⚖═339(5)—City's contract for street paving, providing for sewer mains, was not required to provide also for disposal of sewerage (Acts 40th Leg. 1st Called Sess. [1927] c. 106, § 1).**

City entering into contract for street paving under paving Acts 40th Leg. 1st Called Sess. (1927) c. 106, § 1, was not required to provide for outfall disposal of sewerage, though contract provided for sewer mains; disposal of sewerage being ·matter within discretion of governing body.

**13. Constitutional law ⚖═70(1), 72—In absence of fraud or abuse of power, courts will not control exercise of legal functions by governmental bodies.**

Courts will not embarrass or control governmental bodies in exercise of their legal functions, in absence of fraud or some other abuse of power.

Appeal from District Court, Bexar County; W. S. Anderson, Judge.

Suits by W. T. Montgomery and others against the City of Alamo Heights and others for injunctive relief. From orders denying injunctions, plaintiffs appeal. Affirmed.

Dodson & Ezell, of San Antonio, for appellants.

G. R. Gillette and C. C. Wurzbach, both of San Antonio, for appellees.

COBBS, J. Appellants, as taxpayers in the city of Alamo Heights, sued appellee, a municipal corporation incorporated under the general laws of Texas, domiciled in Bexar county, seeking by way of a temporary injunction to restrain appellee from proceeding under an alleged contract to spend the city's money, upon the following alleged grounds, among others, to wit:

"(1) That the contract had never been authorized by ordinance of the city council. This objection was met after the suit was filed by the city council ratifying the execution of the contract by the mayor and requiring a new bond.

"(2) That the contract was violative of public policy.

"(3) That the city of Alamo Heights had no power to contract for the paving of streets wholly at the expense of bonds which had been voted for street improvements and without assessing any part of the cost against the abutting property which should enjoy the benefits resulting from the street improvements, and that the contract to so do was void.

"(4) That the act of the city council in proceeding to expend under the contract money which had been voted for sewer construction, without any arrangement for disposal or knowledge of what disposal, if any, would be adopted in the future, manifested a reckless abuse of discretion.

"(5) That the contract was partial to Colglazier & Hoff, Inc., and prejudicial to the city of Alamo Heights, provided exorbitant compensation, that it was never intended to in fact impose upon Colglazier & Hoff, Inc., any obligation to finance the furnishing of materials, but only to secure to them 12 per cent. upon the cost thereof paid by the city, and that the awarding of such contract to Colglazier & Hoff, Inc., was the result of some character of previous understanding that it should be so awarded. These presented issues of fact, in the development of which a large mass of testimony was heard by the trial court."

Appellee answered and denied under oath all the material allegations in the bill, and, after a hearing upon full evidence, the court denied the prayer. There is no statement of facts or findings of the court made in the case; the excuse being that the stenographer would require at least 90 days more to prepare a statement of facts, and appellees were then preparing to expend the money under the contract. The order was entered denying the injunction. Thereafter appellants immediately amended their pleadings, confining the request for temporary injunctive relief to questions of law and facts which the hearing disclosed, renewing application for temporary injunction in the same case, so that, upon a denial of the injunction, an appeal could be had before all the money which had been provided for these improvements would be expended. This prayer for further injunction was denied, and appellants duly appealed to this court from both orders; and, upon motion in this court, the two suits were consolidated into one and will run under the docket Nos. 8032, 8033 consolidated.

As the power of the city in making the paving contract and its validity is so vigorously assailed, for a better understanding thereof we copy the same from appellants' brief, as follows:

"This agreement, made this 9th day of September, in the year of nineteen hundred twenty-seven (1927) by and between Colglazier & Hoff, Inc., a Texas corporation, hereinafter called contractor, and the city of Alamo Heights, Bexar county, Texas, represented by its mayor, Robt. E. O'Grady, hereto fully authorized to act by virtue of an ordinance passed by the city council on the 6th day of September, 1927, hereinafter called city, witnesseth:

"That whereas the city intends to do certain excavating and grading and to construct certain storm and sanitary sewers, street pavements, curbs, and miscellaneous structures:

"Now therefore, in consideration of the compensation hereinafter specified, the contractor and the city agree as follows:

"Article 1:

"The contractor agrees to provide all labor, tools, equipment, and materials and to do all things necessary for the proper construction and completion of the work hereinbefore described and as shown on drawings, plans, and specifications prepared by the consulting engineer for

⚖═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the city of Alamo Heights, and in accordance with the directions of said engineer, which, together with this agreement, constitute the contract; the plans and specifications being as fully a part hereof as if hereto attached or herein repeated. The said documents having been prepared by Mr. R. O. Thaxton, consulting engineer, for the city of Alamo Heights on this work, therein and hereinafter called the engineer.

"Article 2:

"The contractor shall exercise, for the city's benefit, his best knowledge and skill in planning the execution of the work, purchasing materials, furnishing labor, supplying equipment, and performing all other services incident to the work, and he shall co-operate fully with the city and the engineer, and faithfully execute the intent of this agreement.

"Article 3:

"The service fee shall be twelve (12%) per cent. of the cost of the work, and shall include and cover payment for the following:

"(a) Contractor's profit.

"(b) The professional services of the contractor, his executive officers, and members of his firm.

"(c) The services of the contractor's main office employees.

"(d) All general expense of maintaining contractor's organization and doing business directly occasioned by this contract.

"(e) The use of contractor's tools, plant, and equipment.

"Article 4:

"The city shall receive the full benefit of all rebates and refunds, and shall receive the full benefit of the discount on all sums paid directly with its capital, if paid in time to secure, trade discount.

"Article 5:

"The contractor shall furnish all funds for and shall provide payment for all expenditures incident to the execution of this agreement, and the contractor is to be reimbursed by the city for such expenditures every thirty days as hereinafter provided for.

"Article 6:

"No expenditure including purchase of materials, or transactions of subcontract involving more than $500 shall be made in connection with this contract without the approval of the engineer, except that the engineer may authorize the contractor, in writing, to make certain expenditures in accordance with the contractor's judgment, in which case such authorization shall constitute the city's authority for such expenditure. The city shall have the right to make any expenditure or to arrange for any purchase from any dealer, provided same be done through the contractor as fiscal agent for the city.

"Article 7:

"All payments shall be made by the city in accordance with statements issued and certified by the contractor and approved by the engineer; said statements to be made every month. The city is to pay such statements within three days after same are presented by the contractor.

"Such statements to include all materials purchased, pay rolls, team and truck hire, freight and other expenses incurred by the contractor in the performance of this work. The contractor's profit fee or service fee shall be paid by the city as follows:

"One-half to be paid monthly with the general statement, and one-half to be paid on completion of the work contemplated in this contract.

"Article 8:

"The contractor shall keep, during the progress of the work, and preserve for one year after final settlement, accurate and detailed accounts of all disbursements, and he shall give the city access at any time to all books, accounts, documents, and correspondence of the contractor which pertain to the execution of this contract.

"If the city so desires, it shall have the right to place competent employees of its own in any position of accounting, timekeeping, and checking, provided such employees shall perform their respective duties in accordance with contractors' plans for handling the work, and in co-operation with the contractor's employees.

"Article 9:

"The monthly statements of expenses as referred to in article 7 shall be accompanied by certified copies of pay rolls, and either original invoices or certified copies of invoices covering all expenditures not carried on the pay rolls. The fifth day of each month shall be the approximate date on which monthly statement shall be rendered.

"Article 10:

"No subcontracts shall be let by the contractor.

"Article 11:

"The contractor shall abide by all legal restrictions and obligations of the locality wherein the work is located. In the event any such legal restrictions or obligations should be violated by the contractor, or any of his employees, the city shall be indemnified and held harmless by the contractor from any legal action resulting from such violation.

"The contractor shall obtain in the name of the city all permits and licenses necessary to execute the work, the cost thereof to be paid as 'cost of the work,' and the city and contractor shall comply with all legal requirements relative thereto.

"Article 12:

"The city is to pay for the construction bond of said contractor, together with all liability necessary to cover said job, on which premium the contractor is not to receive his percentage of profit; said surety company to be acceptable to both city and contractor.

"Article 13:

"The contractor shall indemnify the city and hold it harmless from all liens and other incumbrances against the premises on account of debts or claims alleged to be due from the contractor to any person, including subcontractor employed by or under him.

"Article 14:

"The contractor shall commence work within five days after receipt of written notice after signing of this contract and shall vigorously push the work to completion as designated by the engineer, and complete the same within 12 months after such notification. Should the contractor be delayed in completing the work by any strikes, fire, or other circumstances beyond his control, the time of completion shall be extended for such time as will compensate for the time lost by reason of all such acts or circumstances.

"Article 15:

"Upkeep of all machinery, including ditching machinery, concrete mixer, roller, oiler, sweeper,

and other tools shall be borne by contractor, and contractor shall assume full responsibility for all such tools.

"Article 16:

"The city shall have the right, on ten days' written notice, to terminate this contract if the contractor violates any of its terms. In the event the city shall terminate the contract, it shall have the right to take possession of the site and all materials and plant thereon and to complete or to employ any person to complete the work, provided it shall assume all liabilities and obligations which the contractor has assumed in good faith and pay for the following:

"(a) A per cent. of the profit fee equal to that per cent. which the total cost of the work, up to the time of termination, is of the estimated cost of the work.

"(b) The cost of the work up to the termination of the contract as herein provided.

"(c) Rental shall be allowed for equipment taken over if contract is terminated.

"Article 17:

"The contractor shall have the right to terminate the contract after ten days' written notice under the following conditions:

"(a) If the work should be stopped by court order or other public authority for a period of more than thirty days through no act or fault of the contractor.

"(b) If the city shall fail to pay the contractor in accordance with the terms of this contract.

"In the event that the contractor shall terminate the contract as provided in this article, he shall have the right to remove all things from the site which belong to him and return to the renters all things rented by him to prosecute the work; and the owner shall pay him the sums stipulated hereinbefore, and shall assume all liabilities and obligations which the contractor has assumed in good faith.

"Article 18:

"The title of all materials for which the city is required to pay and all work either completed or in the course of construction shall be in the city. Title of all equipment not purchased by the city shall be in the contractor or in the renter, in the case of rented equipment.

"Article 19:

"Neither party to the contract shall assign the contract or any interest therein, without the written consent of the other party.

"The contractor and the city, for themselves, their successors, executors, administrators, and assigns, hereby agree to the full performance of the covenants herein contained.

"In witness whereof they have executed this agreement the day and year first above written.

"R. E. O'Grady, Mayor.

"Colglazier & Hoff, Contractor,

"By R. W. Colglazier, Pres.

"[Seal of the City of Alamo Heights.]

"Attest: W. H. Hume, City Clerk."

This case is somewhat like the case of Edelstein v. Edelstein, 6 S.W.(2d) 400, just decided by this court, not yet published. It is without any finding of facts which justify us in concluding there was evidence before the court sufficient upon which to predicate the judgment on any fact question which the court necessarily found in appellee's favor. So only questions of fundamental law will be considered.

The first question is as to the power of the city to make the assessment and execute the contract to pave the streets, lay sewers, etc.

The law provides two modes. Under chapter 8, on the subject of streets and alleys, one provision is made for special assessment plan, providing "the city council pay one-third and the owner of the property two-thirds," etc. Rev. St. 1925, art. 1082. That method was not pursued here, and is entirely separate and distinct from the other method, such as is provided for in chapter 9, on the general subject of street improvements. There, general power is granted "to improve any highway within their limits, by filling, grading, raising, paving or repaving the same in a permanent manner, or by the construction or reconstruction of sidewalks, curbs and gutters, or by widening, narrowing or straightening the same, and to construct necessary appurtenances thereto, including sewers and drains." Article 1086.

Article 1087 gives the city power to order improvements and select the materials and methods for such improvements, and to contract for the construction of such improvements in the name of the city, and to provide for the payment of the costs of such improvements out of any available funds of the city.

In this discussion we lay out of sight altogether any question of special benefits as provided by chapter 8 or article 1090, article 1093, etc., in respect to assessment certificates and such relating to special assessments against private abutting property owners, as not arising in this case.

Article 1088 provides for the costs to be paid by the city or partly by the city and partly by the owners of the property abutting thereon, but "the whole cost of construction of sidewalks and curbs in front of any property may be assessed against the owner thereof or his property."

As to whether the rights of any contractor were fully protected under the law, an attempt was certainly made to do so, if valid, by the Act of June, 1927. See section 17 thereof. It is not necessary to discuss the changes made by the last law, for it gave, as the old law did not, the full power to certain towns and cities to pass ordinances and all proceedings necessary to enter into valid contracts for the improvement and to provide for every step and detail necessary to accomplish the purpose. We mean to say, the city now has power to let contracts and provide by ordinance for a bond issue to secure money to pay for the work.

[1] One of the public duties imposed upon a municipal government, a quasi public agency, is to provide for its inhabitants proper streets, water, and lights, and clean sanitation. In carrying out this governmental principle, its hands will not be restrained, in the absence of illegal or arbitrary action. So that, whatever the city may do by itself, it can

delegate another to do by proper contract; but of course not delegate any of its municipal powers.

[2] In cases where no special assessments are made against individual property owners to pay for paving, the city has the right to pay for paving and regulate the procedure in cases whether assessments are to be made or not.

Chapter 9, tit. 28, of Revised Statutes 1925, makes provision for adopting powers to make special assessments under street improvement law of 1909, by a vote of the resident property owners in case they petitioned the city as provided by article 1104, but the municipal government body could provide the entire cost of street improvements to be made payable out of the city's available funds or partly by assessments, as it determined.

[3] In regard to the question of paving strips along the streets or leaving strips unpaved, adjoining property, we do not think that material to consider here. Yet, in cases of special assessments, even though the property sought to be assessed is a homestead, we can see no reason why the street should be left unpaved, for the city may be reimbursed for such costs some time in the future, for no purchaser could safely buy until the liens were discharged. Where the paving is to be paid for by a general bond issue, we cannot see much reason why the entire street is not paved from curb to curb. Still that is a matter lodged with the city to pass on.

It must not be overlooked in this discussion that appellee, in arranging for this paving, was acting under all 'the various cumulative provisions of paving laws conferring necessary powers on the city council, whether acting under any particular statute or not, but was acting under the general powers delegated to it as the agent of the citizens in a city, acting under charter, or general laws governing cities of less than 5,000 inhabitants.

As these causes have been properly consolidated, we take no notice of the pleas of res adjudicata of the issues in the two cases. Indeed they are not sufficiently separate and apart to effect the result sought to be obtained. The two causes are here consolidated, and are to be settled by one judgment.

[4] This case was tried before a court sitting as a chancellor, whose duty it was to pass upon both the law and the facts. It would have been better and more satisfactory for the court to have made findings and embraced them in the decree, or to have presented them in some other way, but that was not done, and we must assume all the necessary facts have been found in support of the court's decree. It is held in Spence et al. v. Fenchler et al., 107 Tex. 443, 180 S. W. 597:

"In considering this appeal upon its merits, we find that, as is stated in the brief of defendants in error, the record shows 'no statement of facts, no bills of exception, no conclusions of law or of fact, no order of court showing what was done with the demurrers, nothing showing what took place in the court below relevant to this appeal except the above-mentioned pleadings and the order of court, aforesaid, refusing the injunction, but not disclosing whether such refusal was based on the law or the facts, or both combined.'

"Under such circumstances, this appeal, relating, solely, to a temporary injunction, the equities of the parties should be tested and compared by their pleadings and the law of the case; and, unless the judgment rendered by the Court of Civil Appeals is one which that court could not properly render, in that state of the record, we must affirm it, even though the opinion of that court may assign insufficient or erroneous reasons in support of such judgment. Love v. Powell, 67 Tex. 15, 2 S. W. 456; Hoyt v. McLaughlin, 250 Ill. 442, 95 N. E. 464; Puget Sound Natl. Bank of Seattle v. King County [C. C.] 57 F. 433. See also, article 4663, Rev. Stats. 1911; Daniels v. Daniels [Tex. Civ. App.] 127 S. W. 560; Lodge v. Cole [62 Tex. Civ. App. 500] 131 S. W. 1180; Eason v. Killough, 1 White & W. Civ. Cas. Ct. App. § 604."

[5] The trial court, having heard this admittedly "wide range" of evidence, was in a peculiarly favorable position to judge the equities and merits of the case, and under such conditions the rule is peculiarly appropriate that the discretion exercised by the trial court should not be disturbed. Wells Fargo & Co. v. Guilheim (Tex. Civ. App.) 169 S. W. 1053; Southern Oil & Gas Co. v. Mexia Oil & Gas Co. (Tex. Civ. App.) 186 S. W. 446, Sutherland v. City of Winnsboro (Tex. Civ. App.) 225 S. W. 63; Ward County Water Improvement Dist. No. 2 v. Ward County Irr. Dist. No. 1 (Tex. Civ. App.) 214 S. W. 490; Beirne v. North Texas Gas Co. (Tex. Civ. App.) 221 S. W. 301; George v. Jonesville Oil & Gas Co. (Tex. Civ. App.) 226 S. W. 445; Branch v. Stephens County (Tex. Civ. App.) 258 S. W. 834; Wilmut v. Franklin (Tex. Civ. App.) 268 S. W. 971.

[6] The rule should be applied that, when the verified answers, as they do in this case, deny all material allegations of the petition, and no statement of facts is produced, the trial court's exercise of discretion will not be disturbed if the pleadings support the judgment. Branch v. Stephens County (Tex. Civ. App.) 258 S. W. 834; Spence et al. v. Fenchler, 107 Tex. 443, 180 S. W. 597.

One of the difficult questions for the writer to thrash out and sanction was that provision of the contract in respect to the so-called cost plus plan. Among the authorities cited by appellee, in support of the "cost plus" contract, are the following: Shaw v. Beaumont Co., 88 N. J. Eq. 333, 102 A. 151, and 2 A. L. R. 122, the latter with note, "Construction of 'cost plus' contracts"; Lytle Campbell & Co., Inc., v. Somers, Fitler & Todd Co. (1923) 276 Pa. 409, 120 A. 409, 27 A. L. R. 41, the latter with note specially briefing "cost plus

contracts," under divers heads. Crowe v. Boyle, 184 Cal. 117, 193 P. 111 to 130, was a case of a "cost plus" contract made by the city and county of San Francisco for the construction of an aqueduct, almost $8,000,000. Taxpayers alleged the invalidity of this contract and sought to enjoin the payment of an installment of $276,000. The contract as authorized by ordinance was sustained, and the injunction denied, and the Supreme Court affirmed this judgment.

In appellees' second supplemental brief they cite additional authorities as follows: McGovern v. City of New York, 234 N. Y. 377, 138 N. E. 26, 25 A. L. R. 1442; McGillivrae et al. v. City of Bremerton et al., 90 Wash. 394, 156 P. 23; Ruling Case Law, vol. 6, "Contracts," § 100; Elliott on Contracts, vol. 2, § 650; Valdes v. Larrinaga, 233 U. S. 705, 709, 34 S. Ct. 750, 58 L. Ed. 1163; Steele v. Drummond, 275 U. S. 199, 48 S. Ct. 53, 72 L. Ed. ——; Miller v. Roberts, 18 Tex. 16, 67 Am. Dec. 688; Stickney v. Hughes, 12 Wyo. 397, 75 P. 945; Trumpf v. Shoudy, 166 Wis. 353, 164 N. W. 454; Slaughter Cattle Co. v. Potter County (Tex. Civ. App.) 235 S. W. 295, affirmed (Tex. Com. App.) 254 S. W. 775.

[7] Generally, contracts for public improvements, supplies equipment, or at least those involving the expenditure of a considerable sum of money are let by competitive bidding, after first being advertised. Such requirements are for the purpose of stimulating competition, preventing favoritism and fraud, and to secure the best work or supplies at the lowest practicable price, and are enacted for the benefit of property holders and taxpayers. And, where the effect of an ordinance, or a contract, is to prevent or restrict competition, favor a contractor or materialman, or increase the cost of the work, it violates manifestly a salutary principle of law, and is void, as well as all proceedings had thereunder.

While the expression "public policy" does not seem to have been ever restricted by the courts, by a precise definition, this expression may be safely applied to any contract which contravenes the established welfare of a community, and is adverse to the principles which underlie the security of our government.

The expenditure of public funds should be fairly done within the limits of the safeguards generally accepted, thus keeping the public official in the confidence of his constituency; and it is recognized that competition is calculated to accomplish this end in the most practical and efficient manner.

The contract under consideration does not measure up to the accepted standard dictated by the certainties required in contracts for public works.

Article 1086, § 1, provides:

"Towns, cities and villages, incorporated under either general or special law, which shall accept the benefits of this chapter * * * shall have power to improve any highway within their limits."

The Paving Act of 1927 (Gen. & Sp. Acts, 40th. Leg., 1st Called Sess. c. 106), section 1, provides:

"Cities, towns and villages incorporated under either general or special law * * * shall have power to cause to be improved," etc.

In the first-named law (article 1086) is granted this general power to towns and cities only "which shall accept the benefits of this chapter." The manner of its acceptance is set out in article 1104. No such requirement or condition precedent appears in the act of 1927, as it did in article 1086.

[8] It is not necessary for such cities or towns functioning prior to that act or thereafter to follow the requirements of any other act than that of 1927. While it is the caption, "This act shall not repeal any charter provision or law, general or special, but shall exist as alternative," etc., yet the two acts in question, the first section of each are in conflict, so that we shall follow the latter act, which leads us to hold the act of 1927 gives to the city of Alamo Heights the necessary powers claimed for it. This power is granted without any reference to the requirements of article 1104 to pave streets. See section 17, c. 106, Act 1927, which was clearly in the mind of the Legislature to make adequate and definite the manner of constructing street improvements and assessments.

The payment for the services of the contractor are provided for in article 3 of the contract, as follows:

"The service fee shall be twelve (12%) per cent. of the cost of the work, and shall include and cover payment for the following:

"(a) Contractor's profit.

"(b) The professional services of the contractor, his executive officers, and members of his firm.

"(c) The services of the contractor's main office employees.

"(d) All general expense of maintaining contractor's organization and doing business directly occasioned by this contract.

"(e) The use of contractor's tools, plant, and equipment."

Article 6 of the contract is as follows:

"No expenditure including purchase of materials, or transactions of subcontract involving more than $500 shall be made in connection with this contract without the approval of the engineer, except that the engineer may authorize the contractor, in writing, to make certain expenditures in accordance with the contractor's judgment, in which case such authorization shall constitute the city's authority for such expenditure. The city shall have the right to make any expenditure or to arrange for any purchase from any dealer, provided same be

done through the contractor as fiscal agent for the city."

This is a dangerous power for the city to pass out of its hands without limitation or restriction. It is turned over to the contractor's judgment with the engineer's approval, without any reservation, to make expenditures over $500.

This vast power was contracted away and not reserved by the city, though it attempted to remedy it by providing in article 8 of the contract the city shall have the "right to place competent employees of its own in any position of accounting, timekeeping, and checking, provided such employees shall perform their respective duties in accordance with the contractors' plans * * * and in co-operation with the contractor's employees."

A city doing a public work should surround itself with and retain all the powers it possesses and not pass or barter any part of its surveillance and ministerial duties to other instrumentalities outside of the city itself. Ordinarily, in the expenditure of large amounts, such as here, the contract should be let out on competitive bidding; however, it was not shown that it was not done in this case, nor that there was any statutory prohibition against it. Dalby v. City of Longmont, 81 Colo. 271, 256 P. 311. There is no fact to show but what the contract was let out by competing bids, so we may be permitted to assume that it was, if such be necessary to sustain the judgment, since every presumption must be indulged in that there was evidence to show every fact necessary to support the judgment of the trial court, provided that fact be necessary.

McQuillin on Municipal Corporations, vol. III, p. 2627, calls attention to the fact that:

"Contracts for public improvements, and most municipal contracts for supplies, printing, etc., at least those involving the expenditure of a considerable sum, are required, in nearly every municipality, by statute or charter provision, to be let by competitive bidding."

Undoubtedly, when that course is not pursued where large expenditures of money are made, it seems a distinct departure from the rule, and raises questions of doubt, both as to its validity as well as to its policy,

How well Mr. McQuillin has put that question in volume III, Municipal Corporations, when he says, on page 2630, § 1184:

"Generally there are charter or statutory provisions requiring proposals for bids for certain municipal contracts to be advertised and the contract let to the lowest and best, or lowest responsible bidder. Such requirements are for the purpose of inviting competition and preventing favoritism and fraud, and to secure the best work or supplies at the lowest price practicable, and are enacted for the benefit of property holders and taxpayers, and not for the benefit of or to enrich bidders, and are to be executed with sole reference to the public interest.

These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purport."

It is not perceived how the city under this contract and under the facts stated will or can dispose of its sewerage of so-called "purified effluent" water in the San Antonio river, as seems to be contemplated. Corsicana v. King (Tex. Civ. App.) 3 S.W.(2d) 857; City of Marlin v. Criswell (Tex. Civ. App.) 293 S.W. 910. No provision is made for this disposal, but should have been done.

While the contract may be subject to criticism as a cost plus contract, appellant has not shown to our satisfaction that the contract is invalid, or is not one which the city could not make under the law. If it was, then it follows logically the courts will not exercise control over any of its governmental functions that have been imposed upon it.

It is our opinion that the judgment of the trial court must be affirmed, and it is so ordered.

Affirmed.

### On Motion for Rehearing.

On motion for a rehearing, we have given this case as much, indeed far more, consideration than we originally did. We regard the questions involved as of great importance, not only to the parties involved, but to municipal governments especially.

We will set out more of the contention of appellants, as appears in their brief:

"On the 11th day of June, 1927, the taxpayers of Alamo Heights voted improvement bonds in the sum of $180,000 for the purpose of improving streets in said city, and $120,000 for the purpose of constructing sewer improvements in said city.

"On September 2, 1927, R. C. Thaxton addressed to the council of said city a proposal to do all engineering work in connection with the improvements to be constructed with said money for 6 per cent. of the cost of the work. That proposal was accepted on the same day. On September 6, 1927, appellee Colglazier & Hoff, Inc., submitted to the city a proposal to construct all the improvements to the extent provided for by said bond issue and to the full extent of the proceeds derived from the sale of the bonds for the actual cost of such construction plus 12 per cent. That proposal was accepted by ordinance on the same day.

"To the time of the institution of this suit on December 3, 1927, there had not been prepared and completed sufficient plans and working details on which to commence construction of the improvements, and these proposals were received and accepted by the city without it having invited or received from any other person a proposal to do the work.

"The city of Alamo Heights had not, at the time of the receipt of the proposal, or of the filing of this suit, ordered the improvement of any street, with one exception, to wit, that on November 23, 1927, a storm sewer was ordered on Broadway from Basdon avenue to Grace Glan.

"On September 9, 1927, the mayor of the city assumed to execute in its behalf a contract between the city and appellee Colglazier & Hoff, Inc., for the construction by it of the proposed improvements in accordance with the terms of that contract. The city proposed and proposes to construct curbs, gutters, and pavement wholly at the cost of the city, to be paid from the proceeds of said bonds, and without assessing against abutting property and owners thereof any portion of the costs of such improvements; it proposed and proposes through the contract to surrender and delegate to Colglazier & Hoff, Inc., the determination of all costs of construction, except such materials as the city may be permitted to and may purchase directly under the terms of the contract, and to pay Colglazier & Hoff, Inc., as its compensation 12 per cent. upon all such costs and purchases, and also to pay all bond premiums incurred by it in connection with the work.

"The city council of Alamo Heights wrote a letter addressed to the taxpayers as an inducement for them to vote bonds for sewer construction, stating that arrangements had been made to connect the proposed Alamo Heights sewer system with that of the city of San Antonio, in event sewer bonds be voted. The bonds were voted, but before making the contract here challenged it was a known fact that such proposed sewer system could not be connected with that of the city of San Antonio. Without any method for disposal available, and not knowing how or where disposal could or would be had, or the cost thereof, the city proposed and proposes under the contract, to expend the bond money in constructing lines of sewers, without knowledge that the lines when constructed would be adapted to such disposal, if any, as may be hereafter provided.

"The appellee Colglazier & Hoff, Inc., to aid the city council to procure the voting of the bonds, furnished, without any agreement for or expectation of receiving compensation, services of its officers and surveyors and engineers at a substantial expense to procure and furnish data essential to the proposed bond issue. After the bonds were voted, the contract challenged was awarded to Colglazier & Hoff, Inc., without competition.

"This suit was instituted by appellants as taxpayers seeking a temporary injunction against proceeding with the contract, or the expending of any money thereon."

[9] The contractors entered into the bond required by the city, and the contract was let under the city ordinance. There is no statute requiring competitive bidding as the basis for a contract by a city incorporated under the general laws. There is such a statute with reference to counties, where the amount involved exceeds a certain sum. There being no statute requiring competitive bids to be taken by the city of Alamo Heights for street or sewer improvements, it had the power to enter into a contract for that purpose without requiring competitive bids.

[10] The contention that the city of Alamo Heights could not contract for street improvements to be paid entirely by the city, even though out of the proceeds of a bond issue, without providing for the assessment of a portion of the costs against the abutting property and its owners, is without merit. Reliance is placed by appellants upon chapter 8 of the Statutes of 1925, which was originally enacted as sections 126 to 129 of an Act approved March 18, 1875. See Gammel's Laws, vol. 8, pp. 148 to 150.

Section 32 of the same act gives cities exclusive control and power over the streets, alleys, and public highways of the city, and power to open, alter, widen, extend, establish, regulate, clean, grade, or otherwise improve the same.

The legislative act now known as chapter 8 of the Statutes of 1925 has been brought forward by codifiers, notwithstanding it is invalid under the decision in the case of Hutcheson v. Storrie, 92 Tex. 685, 51 S. W. 848, 71 Am. St. Rep. 884, for want of provisions relating to hearing to determine benefits. It was decided in 1899, overruling other Texas decisions on the same point. Chapter 9, Revised Statutes 1925, was passed in 1909, evidently for the purpose of affording an opportunity to cities and towns of making street improvements on the assessment plan, and of complying with the decision in Hutcheson v. Storrie, supra. Chapter 106 of the Acts of the Special Session of the Fortieth Legislature was passed evidently for the purpose of affording a better system for levying assessments and for the purpose of enabling cities incorporated under the general law, having population in excess of 1,000 inhabitants, to make street improvements and assess part of the costs against the property owners without first having an election to adopt such law, as was provided in the act of 1909. The effect of the provision of that act is to permit its use by a city like Alamo Heights, even if such city had theretofore adopted the act of 1909.

Article 1016 of the Revised Statutes 1925 confers general power upon cities incorporated under the general law to make street improvements. In view of such general provision and of the act passed by the Fortieth Legislature above referred to, it is clear that the city of Alamo Heights had the power to contract to pay for the improvements entirely out of city funds, without levying assessments against the abutting property for a part of the costs. The act of 1909, not having been adopted in Alamo Heights, has no application in this case.

[11] As the city had the power to make a contract for the improvements in question, without competitive bidding, and has the power to agree to pay therefor entirely out of the city's funds, the next inquiry is whether the contract itself is invalid on account of any of its provisions. It is contended that it is invalid because the work is to be done by the cost plus plan. While the wisdom of any such provision is indeed questionable, no authority is cited, nor have we found any, showing

that our courts have ever held such a contract to be invalid, and the weight of authority, as cited elsewhere herein, seems to support the validity thereof.

It is likewise contended and urged with great insistence that other provisions of the contract render it invalid, the most important of which is to the effect that article 6 of the contract undertakes to delegate to the contractor nondelegable municipal powers, in that it authorizes expenditures by the contractor in amounts less than $500 without the approval of the engineer and in amounts in excess of $500 with the approval of the engineer, and limits the city's right to make its own expenditures for purchases for such improvements through the contractor as fiscal agent for the city. The last-mentioned provision reserves to the city the right to make expenditures and make arrangements for purchasing, but contains the provision that it must be done through the contractor as fiscal agent for the city. It is evidently intended to mean that the city retains the power to make expenditures and to arrange for purchases, but that the actual closing of purchases is to be done through the contractor, no doubt for the purposes of avoiding any confusion in keeping account of what has been expended. The provisions relative to purchases by the contractor, while perhaps unwise, are not such as to render the contract invalid. They do not relate to purely governmental functions, and, while it may not be advisable to permit purchases to be made by a person who receives a percentage upon such purchase, still he would be required under the law to act in good faith and to make purchases to the best advantage. Criticism is also made of the last paragraph of article 8, relating to the city's right to place employees of its own in positions of accounting, timekeeping, and checking; it being further provided that such employees shall perform their respective duties in accordance with the contract for handling the work in co-operation with the contractor's employees. This provision does not destroy the reservation made by the city, but limits it for the purpose of leaving the contractor in control of the work. The work of accounting, timekeeping, and checking, when performed by the city's employees, must evidently be done at such time and place as will not interfere with the carrying forward of the construction work and in co-operation with the contractor's employees who may have duties to perform with reference thereto so as not to interfere with the proper progress of the work.

There does not seem to be any conflict between the reservation and the proviso, and does not appear to be anything in the particular part of the contract as would authorize the court to declare it invalid. Other claims of inconsistencies and ambiguities are made, but such inconsistencies and ambiguities as may exist raise questions of construction of the contract which may have to be worked out by resort to extrinsic facts and circumstances in some instances, but same do not affect the validity of the contract.

As heretofore stated, it is discretionary with the governing body to pave streets wholly at the expense of bonds voted for street improvements or under the plan of assessing a portion of the cost against abutting property.

[12] If the governing body proceeds regularly and legally, it is within their discretion to say what work shall be done, and whether or not disposal of sewerage after leaving the outfall has been provided for is a matter within that discretion. If no arrangements had been made for disposal of sewerage, then, of course, the sewers cannot be used because of the danger to public health. It is not required that the same contract which provides for the sewer mains shall provide for the outfall disposal.

[13] It is not the province nor the desire of courts to embarrass or control governmental bodies in the exercise of their legal functions, in the absence of fraud or some other great abuse of arbitrary power.

The motion for a rehearing is overruled.